IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| NOOR ALKHALILI, et al.,<br>Plaintiffs,<br>v.<br>ISLAMIC REPUBLIC OF IRAN, DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,<br>Defendants. | 1:25-cv-601 (LMB/WEF) |

MEMORANDUM OPINION

Before the Court are a Motion for Default Judgment as to Liability and a Motion for Default Judgment as to Damages (collectively, "Default Motions") brought by 47 United States nationals, including servicemembers and civilians who were either killed or injured in seven terrorist attacks between 2019 and 2023, together with immediate family members of those victims, seeking compensation from the Islamic Republic of Iran ("Iran") and the Democratic People's Republic of Korea ("North Korea") under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A (the "FSIA"). [Dkt. No. 1]. The Complaint alleges that Iran and North Korea provided material support to the terrorist groups that committed the attacks. Because, after being properly served, Iran and North Korea did not answer the Complaint, a default was entered against them. [Dkt. No. 30]. Plaintiffs now move the Court for entry of judgment on the default against each defendant, holding Iran and North Korea jointly and severally liable for their material support of the attacks, and awarding plaintiffs compensatory and punitive damages for the deaths and injuries they or their family members sustained. See [Dkt. Nos. 36, 39].

## I. JURISDICTION

Despite the entries of default, under the FSIA a default judgment against a foreign state may be entered only after: (1) subject matter jurisdiction exists and personal jurisdiction has been properly established through valid service of process under 28 U.S.C. § 1608, and (2) "a plaintiff 'establishes his claim or right to relief by evidence that is satisfactory to the Court.'" Kaplan v. Cent. Bank of Islamic Republic of Iran, 55 F. Supp. 3d 189, 192 (D.D.C. 2014) (first quoting 28 U.S.C. § 1608(e); and then citing Flatow v. The Islamic Republic of Iran, 999 F.Supp.1, 6 (D.D.C. 1998)). "This provision requires the court to satisfy itself that there exists an adequate legal and factual basis for plaintiffs' claims." Rux v. Republic of Sudan, 495 F. Supp. 2d 541, 544 (E.D. Va. 2007).

The FSIA "provides 'the sole basis for obtaining jurisdiction over a foreign state in [federal] court [ ].'" Rux, 495 F.Supp.2d at 554 (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989)). "Under the FSIA, foreign states enjoy immunity from suit in U.S. courts unless Congress waives immunity under an enumerated exception." Id. (citing 28 U.S.C. § 1604). The applicable exception here is § 1605A, also known as the "terrorism exception." See 28 U.S.C. § 1605A. That section provides, in relevant part, that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). "For a court to hear a claim under this section, Section 1605A also requires that, at the time the 'act' described above occurred, the foreign state was designated as a state sponsor of terrorism and 'the claimant or the victim' was either a national of the United

States or had a qualifying occupation enumerated in paragraph (2)." Kumar v. Republic of Sudan, No. 2:10CV171, 2019 WL 13251350, at *2 (E.D. Va. July 31, 2019) (quoting 28 U.S.C. §§ 1605A(a)(1)-(2)).

Here, plaintiffs' claims against Iran and North Korea meet the requirements of § 1605A for purposes of subject-matter jurisdiction. All plaintiffs are American nationals seeking money damages for personal injuries or deaths or injuries of relatives that occurred from terrorist attacks that were materially supported by Iran and North Korea. [Dkt. No. 37] at 1. Iran was designated a state sponsor of terrorism in 1984 pursuant to section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780), and has remained so designated ever since. See [Dkt. No. 1] at ¶ 9; see State Sponsors of Terrorism, U.S. Dep't of State, https://www.state.gov/state-sponsors-of terrorism/ (last visited Aug. 6, 2026). Similarly, North Korea was designated a state sponsor of terrorism in 1988 pursuant to the same authorities as Iran, and remained continuously designated from 1988 until late 2008, when the United States de-listed North Korea as part of an ultimately unsuccessful attempt to reach a nuclear deal with North Korea. [Dkt. No. 1] at ¶ 10. In 2017, the United States again designated North Korea as a state sponsor of terrorism, and North Korea has remained so designated ever since. Id.; see State Sponsors of Terrorism, U.S. Dep't of State, https://www.state.gov/state-sponsors-of terrorism/ (last visited Aug. 6, 2026).

"Personal jurisdiction over a non-immune sovereign exists so long as service of process has been made under § 1608 of the FSIA." Rux, 495 F.Supp.2d at 555 (internal citation omitted). Section 1608(a) provides four ways in which service can be made on a foreign state:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
>
> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

Plaintiffs have properly served Iran and North Korea pursuant to § 1608(a)(4). Regarding Iran, plaintiffs could not serve Iran under § 1608(a)(1) because the United States does not have any special arrangement for service of process with Iran, and plaintiffs could not serve Iran under § 1608(a)(2) because there are no applicable international conventions for service of judicial documents on Iran. See, e.g., Kaplan, 55 F.Supp.3d at 198. Although plaintiffs attempted to serve Iran under § 1608(a)(3), the attempt was unsuccessful. [Dkt. Nos. 10, 12]. On June 17, 2025, plaintiffs' Motion for an Order Permitting Plaintiffs to Proceed with Service under 28 U.S.C. § 1608(a)(4) was granted, which "established that [Plaintiffs] were unable to serve the

Islamic Republic of Iran . . . under 28 U.S.C. § 1608(a)(1-3)." [Dkt. No. 15]. The Court accordingly ordered plaintiffs to initiate service on Iran under 28 U.S.C. § 1608(a)(4). Id.

On June 28, 2025, the Clerk's Office dispatched two copies of the summons, complaint, and a notice of suit, along with a translation of each into the official language of Iran, by FedEx to the State Department, pursuant to § 1608(a)(4). [Dkt. No. 20]. On February 11, 2026, the State Department provided plaintiffs' counsel proof of service in the form of a certified copy of a diplomatic note indicating that on December 8, 2025, the summons, complaint, and notice of suit were transmitted through diplomatic channels to Iran by the Swiss Federal Department of Foreign Affairs pursuant to 28 U.S.C. § 1608(a)(4). [Dkt. No. 27] at ¶ 7. The State Department also mailed the service documentation for Iran to the Clerk of the Court, and it was entered on the docket on February 17, 2026. [Dkt. No. 25]. The diplomatic note provides appropriate proof of service as to Iran. See 28 U.S.C. § 1608(c)(1) (Under FSIA, service is deemed made "as of the date of transmittal indicated in the certified copy of the diplomatic note."); see also see also Adamkavicius v. Islamic Republic of Iran, 2025 WL 2159537, at *26-27 (D.D.C. July 30, 2025) (holding that where the record reflects diplomatic-channel transmittal by the Swiss Federal Department, "it is of no moment that Iran refused to accept" the documents); Levinson v. Islamic Republic of Iran, 443 F. Supp. 3d 158, 175 (D.D.C. 2020) (same); Fritz v. Islamic Republic of Iran, 320 F. Supp. 3d 48, 89 (D.D.C. 2018) (same); Ben-Rafael v. Islamic Republic of Iran, 540 F. Supp. 2d 39, 52-53 (D.D.C. 2008) (same).

Plaintiffs encountered similar service challenges with North Korea. They could not serve North Korea under 28 U.S.C. § 1608(a)(1) because the United States does not have any special arrangement for service of process with North Korea, and they could not serve North Korea under § 1608(a)(2) because there are no applicable international conventions on service of

judicial documents on North Korea. See, e.g., Kaplan, 55 F.Supp.3d at 198. Plaintiffs' attempted service under § 1608(a)(3) was also unsuccessful. [Dkt. Nos. 11-12]. On June 17, 2025, plaintiffs' Motion for an Order Permitting Plaintiffs to Proceed with Service under 28 U.S.C. § 1608(a)(4) was granted. [Dkt. No. 15]. That Order found that "[Plaintiffs] were unable to serve . . . the Democratic People's Republic of Korea under 28 U.S.C. § 1608(a)(1-3)," and authorized plaintiffs to initiate service on North Korea under 28 U.S.C. § 1608(a)(4). Id.

On June 28, 2025, pursuant to § 1608(a)(4), the Clerk's Office dispatched by FedEx to the State Department two copies of the summons, complaint, and a notice of suit, along with a translation of each into the official language of North Korea. [Dkt. No. 20]. On December 8, 2025, the State Department provided plaintiffs proof of service in the form of a certified copy of a diplomatic note indicating that on September 11, 2025, the summons, complaint, and notice of suit were transmitted through diplomatic channels to North Korea via the United Nations. [Dkt. No. 23] at 3-4. The State Department also mailed the service documentation for North Korea to the Clerk of the Court, which was received and entered on the docket on December 9, 2025. [Dkt. No. 21]. The diplomatic note provides appropriate proof of service as to North Korea. See 28 U.S.C. § 1608(c)(1) (Under FSIA, service is deemed made "as of the date of transmittal indicated in the certified copy of the diplomatic note.").

## II. LIABILITY

Having determined that it has subject-matter and personal jurisdiction over the defendants, the Court must determine whether the complaint "state[s] a claim to relief that is plausible on its face." Brown v. LuxUrban Hotels, Inc., No. 123CV1071LMBWEF, 2024 WL 761852, at *2 (E.D. Va. Feb. 23, 2024). "[I]n the default judgment context, factual allegations in the complaint are deemed admitted and the 'appropriate inquiry is whether or not the face of the

pleadings supports the default judgment and the causes of action therein.'" STL Emirates Logistics LLC v. Tamerlane Global Svcs., Inc., 2014 WL 12660119, at *2 (E.D. Va. Dec. 11, 2014) (quoting Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians, 187 F.3d 628 (4th Cir. 1999)).

A. Liability under 28 U.S.C. § 1605A

The uncontested allegations in the 93-page Complaint are sufficient to establish Iran and North Korea's liability under 28 U.S.C. § 1605A. Specifically, the Complaint alleges that at all relevant times, Iran and North Korea were designated state sponsors of terrorism, and all victims of the attacks at issue were U.S. nationals. See supra. The allegations support the claims that defendants were behind the extrajudicial killings and attacks by describing the "material support or resources" which enabled each attack, and caused the plaintiffs' injuries or deaths. See 28 U.S.C. § 1605A.

Specifically, regarding Iran, the Complaint alleges that Iran has developed a "vast infrastructure of institutions to facilitate terrorist attacks by proxies throughout the region, amounting to a terrorism machine." [Dkt. No. 1] at ¶ 16. The primary components of Iran's terrorism machine include "key organs of state and economic power." Id. Four of those entities—also known as the "Terrorist Sponsors"—were Ayatollah Khamenei and the Supreme Leader's Office ("SLO"); the Foundation for the Oppressed on Earth (the "Foundation"); the Islamic Revolutionary Guard Corps ("IRGC"), and Hizballah. Id. at ¶ 17. At all relevant times, the Terrorist Sponsors, and each of their members, "were . . . official[s], employee[s], or agent[s] of Iran, and facilitating terrorist attacks was within the scope of their office, employment, or agency." Id. at ¶ 18.

Iran has enabled the Terrorist Sponsors to monopolize key sectors of the Iranian economy (e.g., construction, sanctions evasion, financial sectors), and to convert commercial profits from those sectors to fund terrorist attacks. Id. at ¶¶ 71-76. For example, the Terrorist Sponsors have provided money to Iranian terrorist proxy groups such as the IRGC, Hizaballah, Hamas, PIJ, and JAM, to carry out lethal attacks, id. at ¶¶ 92-93, by, among other actions, providing salary payments, martyr payments, bounty payments, disability payments, and orphan payments to these groups, id. at ¶¶ 94-98. From at least 2000 through 2023, the Terrorist Sponsors supplied funds to Hizaballah amounting to around at least 70% of Hizballah's budget in any given year. Id. at ¶ 116. Hizaballah has used these funds to train other terrorist proxy groups, including JAM, Hamas, PIJ, and al-Qaeda. Id. at ¶ 99; see U.S. Dep't of the Treas., FinCEN Alert to Financial Institutions to Counter Financing of Hizballah and its Terrorist Activities, FIN-2024-Alert003, at 3 (Oct. 23, 2024) ("Iran has trained thousands of Hizballah fighters" to "conduct terrorist operations globally" and, "[i]n turn, Hizballah has helped train and equip other Iran-aligned terrorist organizations, including Hamas" and "Hizballah leaders" also "armed and trained Shia militias that carried out attacks on U.S. forces during their 2003-2011 deployment to Iraq."). From at least 2000 through 2023, the Terrorist Sponsors supplied funds to JAM, Hamas, and PIJ, amounting to at least half of their respective budgets. [Dkt. No. 1] at ¶¶ 125, 132.

The Terrorist Sponsors have also used commercial profits to "design, build, transport, supply, and maintain the arms and weapons systems required for, inter alia, missile, rocket, mortar, uncrewed aerial vehicle ("UAV"), RPG and small arms attacks, among others."). Id. at ¶ 101. These arms and weapons are then supplied to Hizballah, the IRGC, JAM, Hamas, PIJ, and al-Qaeda, to power their attacks globally. Id. The Terrorist Sponsors have used resources and technologies from their commercial activities to recruit IRGC, Hizaballah, JAM, Hamas, and PIJ

operatives, including children, to power attacks, id. at ¶ 107, and to manufacture and supply intelligence tools, including, but not limited to, targeting data, signals intelligence, and systems for internet and telecommunications content monitoring, filtering, and eavesdropping. Id. at ¶¶ 108-114.

The Complaint alleges that North Korea is "Iran's most powerful nation-state partner," [Dkt. No. 37] at 16 (citing Celso, Ex. 11 at 3-5), having provided "extensive material support to Iran, the IRGC, Hizballah, and other Iranian proxies—namely weapons, training, and financial support." Id. at 22-23. The Complaint further alleges that since the early 1980s, North Korea, the IRGC, and Hizballah have "collaborated in a joint weapons venture to develop, manufacture, and deploy missiles and rockets in anti-American terrorist attacks." id., and North Korea has provided training to the IRGC and Hizballah, which has flowed directly through to their proxies, [Dkt. No. 1] at ¶ 100. In the early 2000s, North Korean military personnel were dispatched to southern Lebanon, where they leveraged their expertise to help build extensive underground military installations and an elaborate system of tunnels, which were used most recently in the October 7, 2023 attack in Israel. Id. at ¶¶ 148-49. U.S. government reports have confirmed, and a U.S. federal courts has found, that "North Korea provided Hezbollah with a wide variety of material support and resources," including "professional military and intelligence training and assistance[,]" thereby strengthening Hizballah's and the IRGC's ability to conduct terrorist attacks targeting Americans in Iraq, Syria, and Israel. Id. at ¶¶ 151-53.

B. The Attacks At Issue

The Complaint alleges that each of the seven terrorist attacks at issue was committed by Hizballah, JAM (including Kataib Hizballah), Hamas, PIJ, or al-Qaeda (including al-Shabaab) in Iraq, Syria, Israel, and Kenya between 2019 and 2023, and were "committed, planned, and/or

authorized by terrorists acting as Iran's and North Korea's agents; w[ere] facilitated by the Terrorist Sponsors; and w[ere] enabled by material support and resources provided by Iran and North Korea." Id. at ¶ 173. The Complaint provides details about each attack, the particular plaintiff who was killed or injured, and identifies each family member affected by the death or injury.

The specific attacks at issue are the following. On December 27, 2019, Hizballah and JAM (including Kataib Hizballah), funded, armed, and logistically supported by the Terrorist Sponsors, committed a rocket and UAV attack on the K-1 Air Base in Kirkuk, Iraq, which killed Nawres Hamid, a U.S. civilian working for the Valiant Integrated Services at the time of the attack. Id. at ¶¶ 175-77. Hamid leaves behind plaintiffs Noor Alkhalili (his wife) and A.W. and H.W., his two minor sons. Id. at ¶¶ 178-184. Iran provided material support to this attack by providing direct operational support to the attack teams, including intelligence from IRGC and supplied UAVs and satellite imagery and weapons. Id. at ¶ 176. The United States has confirmed that Iran supplied vital aid to the attack. Id. North Korea materially aided the attack by providing training to Hizballah operatives involved in the attack, as well as weapons used in the attack. Id. at ¶ 177.

On January 5, 2020, al-Shabaab (a branch of al-Qaeda) committed an attack involving rocket propelled grenades, small arms fire, and mortars in Lamu, Kenya, killing Dustin Harrison and Specialist Henry Mayfield Jr. Id. at ¶¶ 185, 188-210. Harrison leaves behind his wife, Hope Harrison, his minor daughter, H.H., his parents, Donna Harison and Marlin Harrison, and his sister, Heide Ryan. Id. at ¶¶ 189-05. Mayfield leaves behind his father, Henry Mayfield Sr.; his sisters, Danielle Davis, Taliyah Davis, and Tyshauna White; his brothers Ronald Edwards, Michael Mayfield, and Nicholas Mayfield; his stepmother, Carmoneta Horton-Mayfield; and his

stepsiblings Tyron Edwards and Ciara Martin. Id. at ¶¶ 198-208. Iran materially aided the attack by providing "financial, logistical, intelligence, and operational support to attacks directed by al-Qaeda's global operations headquarters in Iran from 2017 through . . . 2020." Id. at ¶ 186. The Terrorist Sponsors directly supplied a substantial number of weapons used during the attack, including: (1) small arms with IEI-manufactured optics; and (2) RPGs with IEI-manufactured optics, inclucing RPG-29s with such optics. Id. North Korea materially aided the attack by providing "training, weapons, and terrorist tunnels to the IRGC and Hizballah, who relied upon such goods and services to train, arm, and logistically support al-Shabaab's ability to conduct attacks[.]" Id. at ¶ 187.

On January 8, 2020, a group of IRGC terrorists and Hizaballah/JAM committed an attack with missiles and UAVs targeting the United States at Al Asad Air Base, Iraq, which severely wounded Sergeant Jacob Deer, Private Second Class Brandon Godwin, Private First Class Byron Hogan, Staff Sergeant Torrin Mcdougle, Specialist Ryan Nolan, Sergeant Rodney Ragin, Staff Sergeant Jacob Schmidt, Private First Class Collin Shepard, and Hugh Spears Jr. Id. at ¶¶ 219-253. Plaintiff Deer's wife, Samantha Deer, and his two minor sons J.A.D. and J.C.D., are plaintiffs, id. at ¶¶ 221-24, as are plaintiff Shepard's wife, id. at ¶ 247, and plaintiff Spears's son Brandon Spears, id. at ¶ 252.

The Complaint alleges that Iran aided the attack by providing "direct operational support to the attack teams" in the form of "UAVs and satellite imagery and weapons and communication systems[,] and by providing money and incentive payments . . . to operatives[.]" Id. at ¶ 217. Moreover, "Iran has publicly boasted about its responsibility for the January 8, 2020 Attack." Id. North Korea aided the January 8, 2020 attack by providing training to Hizballah

operatives involved, as well as weapons and/or weapon components used, including Qaim missiles. Id. at ¶ 218.

On March 11, 2020, Hizballah and JAM committed a rocket and UAV attack on Camp Taji in Baghdad, Iraq, killing Specialist Juan Covarrubias. Id. at ¶ 257. Covarrubias leaves behind Bianca Meza-Covarrubias, his widow; Alfredo Covarrubias, his father; and Karen Covarrubias, his sister. Id. at ¶¶ 259-61. Iran directly supported the attack teams, including by providing intelligence, IRGC-made rockets, rocket launchers, artillery computer systems, optics, UAVs, and satellite imagery; and by providing money and incentive payments to operatives from the IRGC, Hizballah, and JAM involved in the attack. Id. at ¶ 255. North Korea aided the attack by providing training to Hizballah operatives involved in the attack, as well as weapons and/or weapon components used in the attack. Id. at ¶ 256.

On November 7, 2022, Hizballah and JAM operatives, funded, armed and logistically supported by Iran's Terrorist Sponsors, committed a targeted killing of a perceived enemy of the Iranian regime in Baghdad, Iraq, killing Stephen Troell. Plaintiffs suing on his behalf include: Jocelyn Troell, his widow; Abigail Troell, A.T., Katelyn Troell, and S.T., his children; Susan Troell and Richard Troell, his parents; and Sarah Sellew, Christina Troell, and Joanna Winn, his sisters. Id. at ¶¶ 268-78. Iran provided money and incentive payments to operatives from the IRGC, Hizballah, and JAM involved in the attack, and provided the weapons and intelligence used. Id. at ¶ 265. The United States has confirmed that Iran supplied vital aid to the November 7, 2022 attack. Id. North Korea aided the attack by providing training to Hizballah operatives involved in the attack, as well as weapons and/or weapon components used in the attack. Id. at ¶ 266.

On March 23, 2023, Hizballah and JAM (including Kataib Hizballah) in Iraq and the IRGC in Iran committed an unmanned aerial vehicle ("UAV") attack in Syria, which killed Scott Dubis. Id. at ¶¶ 281, 284. Plaintiff Shay Dubis, his widow, is suing on his behalf. Id. at ¶ 286. Iran provided direct operational support to the attack teams, including intelligence, IRGC-made rockets, rocket launchers, artillery computer systems, optics, UAVs, and satellite imagery; and provided money and incentive payments to those operatives. Id. at ¶ 282. North Korea aided the March 23, 2023 attack by providing training to Hizballah operatives involved in the attack, as well as weapons and/or weapon components used in the March 23, 2023 attack. Id. at ¶ 283.

On October 7, 2023, Hamas and PIJ "jointly committed a complex multi-front mass terrorist attack targeting dozens of sites in Israel," which severely wounded plaintiffs Bernadette Brauner and Nir Brauner. Id. at ¶¶ 289-301. Iran provided funds, weapons, recruitment assistance, and incentive payments to the operatives involved in the attack, and the United States has confirmed that Iran "supplied vital aid to the October 7 Attack[.]" Id. at ¶ 290. North Korea provided training to Hizballah, Hamas, and PIJ operatives involved in the attack, as well as weapons and/or weapon components, and tunnel-building assistance for it. Id. at ¶ 291.

In sum, these uncontested allegations fully support the conclusion that the defendants are jointly and severally liable to the named plaintiffs for the deaths and injuries they and their family members suffered from these seven attacks.

## III. DAMAGES

Section 1605A(c) provides that victims of state-sponsored terrorism may recover money damages, including damages for economic loss as well as for "solatium, pain and suffering, and punitive damages." Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 82 (D.D.C. 2017). "To obtain compensatory damages in an FSIA case, a plaintiff 'must prove that the consequences

of the defendants' acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate.'" Moradi v. Islamic Republic of Iran, 77 F.Supp.3d 57, 69 (D.D.C. 2015) (quoting Reed v. Islamic Republic of Iran, 845 F.Supp.2d 204, 213 (D.D.C. 2012)). Applying this analysis to the present case, the Complaint satisfactorily shows that Iran and North Korea's material support of the aforementioned terrorist groups had the reasonable certainty and intended consequence of resulting in deaths and injuries to plaintiffs and their family members.

"To determine a reasonable estimate of the resulting harm to each plaintiff, the Court [should rely] on the evidentiary record and prior awards for comparable injuries in other FISA cases." Stewart v. Islamic Republic of Iran, No. 1:22-CV-077, 2024 WL 2779848, at *5 (S.D. Tex. May 30, 2024). Courts across the country have applied the comparator framework for determining damages under FSIA that was first articulated in Est. of Heiser v. Islamic Republic of Iran, 466 F.Supp.2d 229 (D.D.C. 2006) ("Heiser") and further developed in subsequent cases, including Peterson v. Islamic Republic of Iran, 515 F.Supp.2d 25, 54 (D.D.C. 2007). See, e.g., Kumar v. Republic of Sudan, 2015 WL 1291787 (E.D. Va. Mar. 13 2015), vacated on other grounds, 880 F.3d 144, 154-57 (4th Cir. 2018) (for defective service of process) (applying the comparator methodology reflected in Heiser and other D.D.C. cases)[1]; In re: Terrorist Attacks on

[1] As plaintiffs point out, Kumar is the only FSIA terrorism decision from this district applying § 1605A's federal cause of action to calculate individualized damages. [Dkt. No. 41] at 2. In Kumar Judge Doumar applied the same comparator methodology reflected in D.D.C. precedent, but—without explanation—selected significantly lower baselines for solatium damages. 2015 WL 1291787, at *3. Specifically, Judge Doumar "determined that the following solatium damages [were] appropriate for most of these families: (1) $1 million for a spouse, (2) $600,000 for a child, (3) $300,000 for a parent, and (4) $50,000 for a sibling." Id. Plaintiffs argue that the Court should decline to follow the lower baseline damages because "[w]hen Kumar was decided in March 2015, a central feature of today's compensation landscape had not yet existed." [Dkt. No. 41] at 3. Plaintiffs explain that Congress established the United States Victims of State

September 11, 2001, 2025 WL 1343370, at *1 (S.D.N.Y. 2025) (adopting the D.D.C. damages framework articulated earlier in the same litigation, see 2020 WL 762164, at *2 (Feb. 7, 2020)); Stewart, 2024 WL 2779848, at *5-9; Soto v. Islamic Republic of Iran, 2024 WL 1376439, at *12–13 (N.D. Ill. 2024) (same); Baarbé v. Syrian Arab Republic, 679 F. Supp. 3d 303, 416–17 (E.D.N.C. 2023) (same); Miller v. Cartel, 2022 WL 2286952, at *27 (D.N.D. 2022) (same); Weinstock v. Islamic Republic of Iran, 2019 WL 1993778, at *5 (S.D. Fla. 2019) (same). "That framework promotes consistent judgments while preserving the Court's discretion to adjust awards for circumstances." [Dkt. No. 41] st 3 (citing Force v. Islamic Republic of Iran, 617 F.Supp.3d 20, 33 (D.D.C. 2022)).

A. Pain and Suffering Damages

Attached to the Complaint are affidavits from every victim attesting under the penalty of perjury to their injuries and economic losses. These affidavits, which are summarized in the charts below, fully support the damages sought, which the Court will award.

For directly injured claimants, the Heiser and Peterson comparator framework establishes a baseline award of $5 million and gives courts discretion to adjust the award upward or downward based on individualized factors, "including the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will

---

Sponsored Terrorism Fund in December 2015, after Kumar, and that "[b]ecause total eligible claims far exceed available funds, claimants typically recover only a small percentage of their compensatory damages awards." Id. Because plaintiffs' damages claims will be "compared against thousands of FSIA judgments calculated using the Heiser and Peterson frameworks consistently adopted by courts in § 1605A cases[,]" plaintiffs argue that the Court should follow the higher baselines followed by a majority of courts in the country to allow plaintiffs to recover comparable damages. Id. at 3-4. Finding good cause, the Court accordingly declines to follow the damages baselines set out in Kumar and will follow the higher damages baselines set out by the United States District Court of the District of Columbia.

remain with the victim for the rest of his or her life." Force v. Islamic Republic of Iran, 617 F. Supp. 3d 20, 33 (D.D.C. 2022).

| Plaintiff | Injury | Damages Claim |
|---|---|---|
| **Brandon Godwin** | Traumatic brain injury ("TBI") and "serious orthopedic harm," leading to "extreme sensitivity to light and sound, dramatic weight loss from persistent vomiting, and prolonged physical therapy." [Dkt. No. 41] at 6. | $5 million (baseline) |
| **Jacob Schmidt** | Psychological injuries from missile strike, including "headaches, difficulty concentrating, emotional instability and numbness, and sleep disruption." Id. at 7. | $5 million (baseline) |
| **Byron Hogan** | Psychological injuries from missile strike, including "persistent nightmares, anxiety, paranoia, dissociation, hypervigilance, sleep disturbance requiring medication, memory impairment, anger, and disordered eating." Id. | $5 million (baseline) |
| **Rodney Ragin** | Psychological injuries, including "PTSD symptoms, nightmares, memory and concentration problems, emotional detachment, and a profound loss of purpose." Id. | $5 million (baseline) |
| **Torrin McDougle** | PTSD, TBI, and tinnitus, "resulting in a 90% disability rating," as well as "psychological deterioration, including increased alcohol use and suicidal ideation, culminating in a partial suicide attempt." Id. at 8 | $7 million (upward departure of 40%) |
| **Collin Shepard** | TBI and PTSD, as well as "debilitating migraines, anxiety, memory loss, and profound psychological distress." Id. | $7 million (upward departure of 40%) |
| **Jacob Deer** | TBI, head injury, and acromioclavicular joint injury during the missile strike, "resulting in lifelong, debilitating sensitivity to light and sound; severe weight loss from persistent vomiting; chronic pain; chronic and debilitating anxiety; and lasting cognitive impairment affecting memory, sleep, and emotional regulation." Id. at 8-9. | $7 million (upward of 40%) |
| **Ryan Nolan** | Permanent physical and neurological impairments, including a TBI, chronic migraines, spinal injury, | $7 million (upward of 40%) |

| | | |
|---|---|---|
| | hearing loss, and sleep disruption, leading to a 90% disability rating; "intensive, ongoing medical and mental-health treatment[;]" and "permanent loss of independence and normal functioning." Id. at 9 | |
| **Hugh Spears** | Debilitating back injury likely requiring surgical intervention, chronic pain, severe sleep disturbance, and profound psychological trauma later diagnosed as PTSD and depression, resulting in 100% disability rating. Id. | $7 million (upward of 40%) |

B. Solatium Damages

"A claim for solatium refers to the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." Kumar, 2015 WL 1291787, at *2. To recover, Plaintiffs must be members of the deceased's "immediate family[,]" although they need not have been physically present at the attack. Id. "Courts have interpreted the "immediate family" requirement to permit recovery for spouses, children, parents, and siblings. Id. "In determining the amount of solatium damages to award family members of a victim, courts consider the nature of the relationship between the family member and the victim and the severity of the pain suffered by the family member." Id. at 3.

Courts following the Heiser framework have awarded the following to family members of deceased victims: between $8 million and $12 million to a spouse, $5 million to a child or parent, and approximately $2.5 million to a sibling. Force, 617 F.Supp.3d at 36. For family members of injured victims, courts following the Heiser framework have awarded the following: $4 million to a spouse, $2.5 to a child or parent, and approximately $1.25 million to a sibling. Id. When a direct victim suffers severe emotional or psychological injury without accompanying physical injury, courts typically award $1.5 million in damages. See, e.g., Est. of Stephen B.

Bland v. Islamic Republic of Iran, 831 F. Supp. 2d 150, 155 (D.D.C. 2011). And where a family member of a surviving, non-physically injured direct victim suffers solatium damages, courts have awarded reduced amounts to account for the absence of physical injury and to maintain proportionality with awards to direct victims. See id. at 157-58 (awarding mother of non-physically injured plaintiff $1 million); O'Brien v. Islamic Republic of Iran, No. 1:06-cv-690, Mem. Op., Dkt. 42 at 5 (D.D.C. Mar. 28, 2012) (awarding $1 million to surviving spouse of non-physically injured direct victim). "These amounts . . . are merely guideposts, and the Court may deviate depending on the specific circumstances of a given case." Id.

Plaintiffs have requested the following damages:

| | Plaintiff | Injury | Damages Claim |
|---|---|---|---|
| Direct Victims | **Bernadette Brauner** | Psychological trauma and chronic physical symptoms, including "persistent anxiety, panic attacks, and dangerously high blood pressure requiring medication." [Dkt. No. 41] at 11. | $2.5 million ($1.5 million in pain and suffering for direct emotional injuries and $1 million in solatium damages. |
| | **Nir Brauner** | Severe psychological trauma and physical distress, including diagnosed PTSD, relentless panic attacks that mimic heart attacks, and sudden spikes in heart rate. Id. | $2.5 million ($1.5 million in pain and suffering for direct emotional injuries and $1 million in solatium damages) |
| Parents of Attack Victims | **Richard Troell** | Debilitating grief, high blood pressure, loss of motivation, impaired decision-making, extreme mental fatigue, and strained family relationships. Id. at 12. | $5 million (baseline) |
| | **Susan Troell** | Severe mental anguish, emotional pain and suffering, overwhelming fatigue, persistent memory loss, insomnia, and profound emotional isolation. Id. | $5 million (baseline) |
| | **Donna Harrison** | Severe mental anguish, emotional pain and suffering, years of depression, persistent sleeplessness, and social withdrawal. Id. | $5 million (baseline) |
| | **Henry Mayfield Sr.** | Alcoholism "to cope with his unrelenting anguish and anger," | $6.25 million (25% upward departure) |

| | | | |
|---|---|---|---|
| | | serious health conditions, including diabetes and high blood pressure. Id. | |
| **Children of Attack Victims** | **H.W.** | Psychological trauma so severe requiring emergency medical care after he stopped eating; deeply isolated. Id. at 14. | $6.25 million (25% upward departure) |
| | **H.H.** | "Significant and lasting emotional injuries[,]" including anxiety, sleep disturbances, and self-harming behaviors. Id. | $6.25 million (25% upward departure) |
| | **A.W.** | Profound developmental and emotional injuries. Diagnosed with autism weeks after losing his father at 2-years old; for years afterward, A.W. was "largely nonverbal" | $6.25 million (25% upward departure) |
| **Children who Witnessed their father' s death (Troell family)** | **Abigail Troell** | Witnessed her father's death, leading to "overwhelming grief, loss of appetite, anger, and months spent trapped in . . . a 'deep, inescapable fog.'" Id. at 15-16. | $6.25 million (25% upward departure) |
| | **Kaitlyn Troell** | Heard the gunshots that killed her father and witnessed the immediate aftermath. She "experiences flashbacks, anxiety, and heightened sensitivity to loud noises." Id. at 16. | $6.25 million (25% upward departure) |
| | **A.T.** | 12-years-old when she witnessed her father's death, leading to "shock, overwhelming grief, lasting difficulty regulating and expressing her emotions," and trauma. Id. | $6.25 million (25 % upward departure) |
| | **S.T.** | Two-years-old when he witnessed his father's death. Suffers "serious emotional and developmental harm, including regression and persistent separation anxiety, grief, and distress." Id. | $6.25 million (25% upward departure) |
| **Plaintiff Children of Surviving Victims** | **J.C.D.** | Damaged emotional well-being, including anxiety, mood swings, and emotional distance. Id. at 16-17. | $2.5 million (baseline) |
| | **Brandon Spears** | Nightmares, insomnia, heavy alcohol use, and emotional distress from the trauma of reliving the attack on his father, leading to suicidal ideation. These injuries led to counseling and medication for depression, anxiety, | $3.125 million (25% upward departure) |

| | | | |
|---|---|---|---|
| | | and mood stabilization, and they have cost him employment opportunities and disrupted his career. Id. at 17. | |
| | **J.A.D.** | Serious mental health challenges, including depression, anxiety, and mood instability diagnosed as Disruptive Mood Dysregulation Disorder ("DMDD"). Disrupted school and caused him to repeat kindergarten. Id. | $3.25 million (25% upward departure). |
| **Siblings of Attack Victims** | **Marlin Harrison** | Devastation, guilt, depression, and a sense that "a part of [him] had been torn away." Id. at 18. | $2.5 million (baseline) |
| | **Heide Ryan** | Shock, sleepless nights, "many days and nights weeping," and an overwhelming grief. Id. | $2.5 million (baseline) |
| | **Christina Troell** | Psychological and physical trauma, including chronic nightmares, insomnia, persistent depression, and debilitating migraines. Id. The death of her brother has left her "emotionally destabilized and socially withdrawn[.]" Id. | $2.5 million (baseline) |
| | **Joanna Winn** | Profound and continuing psychological injuries, incl. sleeplessness, recurring nightmares, stress-induced hives, social withdrawal, and overwhelming waves of grief. Id. | $2.5 million (baseline) |
| | **Sarah Sellew** | Insomnia, despondency, loss of appetite, nausea, uncontrollable sobbing, and debilitating cognitive symptoms, incl. memory loss, word-finding difficulties, and speech impairment. Id. at 18-19. | $2.5 million (baseline) |
| | **Ronald Edwards** | Debilitating depression, anger, sleeplessness, loss of appetite, persistent thoughts of death. These injuries led to career derailment, social isolation, mood swings, alcohol dependence, and recurring nightmares. Id. at 19. | $2.5 million (baseline) |
| | **Michael Mayfield** | Emotional and psychological injuries, incl. depression, irritability, anger issues, and an overwhelming guilt that | $2.5 million (baseline) |

| | | | |
|---|---|---|---|
| | | has disrupted his ability to eat, sleep, and interact with others. Id. | |
| | **Nicholas Mayfield** | Trauma shattering academic performance in school, impaired ability to function socially, and persistent anxiety and grief. Id. | $2.5 million (baseline) |
| | **Danielle Davis** | Heightened symptoms of PTSD, anxiety, depression, nightmares, and insomnia, leaving her emotionally overwhelmed and withdrawn. Id. These injuries have harmed her physical health through alcohol abuse and emotional eating. Id. | $2.5 million (baseline) |
| | **Taliyah Davis** | Debilitating depression, isolation, and loss of motivation and normal functioning following the death of her brother Henry. Id. at 20. | $2.5 million (baseline) |
| | **Tyshauna White** | Profound and enduring emotional injuries, leading to grief, anger, and isolation. Id. | $2.5 million (baseline) |
| | **Karen Covarrubias-Mendez** | Severe and psychological harm, incl. depression, anxiety, disordered eating, and alcohol abuse, culminating in a suicide attempt. Id. | $3.125 million (25% upward departure) |
| **Spouses of Attack Victims** | **Hope Harrison** | Severe anxiety, depression, panic attacks requiring hospitalization, chronic insomnia, extreme emotional instability, and a 55-pound weight gain. Id. at 21. | $9 million (within baseline range) |
| | **Shay Dubis** | Sharp decline in physical and mental health: exacerbated chronic vertigo from Meniere's disease, worsened bipolar disorder and depression, insomnia, panic attacks, and debilitating pain resulting in hospitalization, neck surgery, and diagnosis of Hypermobile Ehlers-Danlos Syndrome. Id. | $10 million (within baseline) |
| | **Noor Alkhalili** | Loss of sleep, grief, emotional breakdowns, depression. Trauma, which prevented her from completing medical training, straining ability to parent while grieving, and forcing | $10 million (within baseline) |

| | | | |
|---|---|---|---|
| | | years of anguish while raising two children. Id. at 22. | |
| | **Bianca Meza-Covarrubias** | Debilitating grief, anxiety, depression, insomnia, panic attacks, social withdrawal, and symptoms consistent with PTSD, which contributed to suicidal ideation. Id. | $10 million (within baseline) |
| | **Jocelyn Troell** | Witnessed husband's death, leading to profound grief, persistent anxiety, hypervigilance, flashbacks, depression, and a permanent loss of safety. Left to raise 4 children alone. Id. at 22-23. | $10 million (within baseline) |
| **Spouses of Surviving Victims** | **Samantha Deer** | Debilitating flare-ups of fibromyalgia and hidradenitis suppurativa, causing chronic inflammation, impaired mobility, and a 50-pound weight loss. Psychological harm watching her husband struggle with trauma, alcohol dependence, and emotional instability. Id. at 23-24. | $5.6 million (40% upward departure) |
| | **Kaitlin Shepard** | Emotional and marital harm watching her husband's TBI and PTSD. As a result, plaintiff has abandoned her job, relocated across the country, experienced cognitive decline and emotional detachment living under the strain of her husband's anxiety. Id. at 24. | $5.6 million (40% upward departure |
| **Functional Equivalents of Family Members** | **Carmoneta Horton-Mayfield** (stepmother) | Mental breakdowns, deep depression requiring long-term counseling, loss of motivation, an inability to work for months, abandonment of activities that once brought her joy, and overwhelming anxiety. Id. at 25. | $5 million (same baseline as biological parent) |
| | **Tyron Edwards** (half-brother) | Prolonged bouts of uncontrollable crying, inability to eat or sleep, physical wasting, and intense grief. Id. at 25-26. | $2.5 million (same baseline as sibling) |
| | **Ciara Martin** (half-sister) | Depression, debilitating anxiety, traumatic dreams, migraines and insomnia requiring medication, suicidal ideation, and months during which she was unable to work. Id. at 26. | $3.125 million (upward departure of 25%) |

C. Economic Damages

In addition to damages for their injuries, four plaintiffs—Hugh Spears Jr., Torrin McDougle, Ryan Nolan, Collin Shepard, and Jacob Deer—seek economic damages to account for lost income as a result of the attacks. [Dkt. No. 41] at 26. "Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." Force, 617 F. Supp. 3d at 30 (quoting Thuneibat v. Syrian Arab Republic, 167 F. Supp. 3d 22, 48 (D.D.C. 2016)). "Economic damages are typically 'not hard to quantify,' but must be proven with 'competent evidence.'" Id. (quoting Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 71 (D.D.C. 2015)). Courts have "most frequently awarded economic damages to direct victims of terror attacks, as well as to their estates, to compensate for the lost earning capacity of the direct victim herself." Id.

Plaintiffs have requested the following economic damages, with the support of economic loss computations by Chad L. Staller and Stephen M. Dripps of the Center for Forensic Economic Studies:

| **Plaintiff** | **Economic Loss** | **Damages Claim** |
|---|---|---|
| Hugh Spears Jr. | Economic damages to account for lost income as a result of the January 8, 2020 complex attack on Al Assad Airbase in Iraq. Since the incident, Spears, who previously worked as a Heavy Truck Driver and then a Runway Sweeper, has been unable to maintain gainful employment. He has a 100% disability rating from the Department of Veteran Affairs, and is receiving Social Security retirement benefits. [Dkt. No. 41-51]. | $450,465 |
| Torrin McDougle | Economic damages to account for lost income as a result of the January 8, 2020 complex attack on Al Assad Airbase in Iraq. McDougle planned to make a career out of his military service and serve 20 years of active duty to vest in the high-36 military pension plan. After the January 2020 incident, McDougle was honorably discharged from service and has been unable to hold a steady job since. He was unable to | $3,006,834 |

| | | |
|---|---|---|
| | complete a bachelor's degree after being discharged because of his physical and psychological injuries. [Dkt. No. 41-52]. | |
| Ryan Nolan | Economic damages to account for lost income as a result of the January 8, 2026 attack, which led to Nolan's honorable discharge. Nolan planned to make a career out of military service; however, after his discharge, he has had various jobs, with his most recent being a warehouse employee at FCC Hazelton. Nolan has a 90% disability rating from the Department of Veteran Affairs. | $827,354 |
| Collin Shepard | Economic damages to account for lost income as a result of the January 8, 2026 attack, which led to Shepard's honorable discharge. Shepard planned to make a career out of military service; however, after his discharge, he has secured hourly employment with Prime Air as a Flight Monitor. He has a 100% disability rating from the Department of Veterans' Affairs. He does not have a college degree. | $743,925 |
| Jacob Deer | Economic damages to account for lost income as a result of the January 8, 2026 attack, which led to Deer's discharge. Deer had planned to pursue higher education to follow a medical career path prior to the incident, but now has a 100% disability rating from the Department of Veterans' Affairs and is an insurance salesman. He does not have a college degree. Deer supports two minor children, one of whom suffers from a developmental disability. | $3,109,092 |

D. Prejudgment Interest

Plaintiffs also seek $93,705,184 in prejudgment interest, based on the compensatory damages award. [Dkt. No. 41] at 27-28. "The rate of pre-judgment interest for cases involving federal questions is a matter left to the discretion of the district court." Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1031 (4th Cir. 1993) (citing United States v. Dollar Rent A Car Systems, Inc., 712 F.2d 938, 940 (4th Cir. 1983)). Plaintiffs argue that courts have awarded prejudgment interest on plaintiffs' "past economic loss and their non-economic pain and suffering and solatium damages." Force, 617 F. Supp. 3d at 42 (cleaned up). In calculating

prejudgment interest, Plaintiffs have adopted the methodology described in Ewan v. Islamic Republic of Iran. 466 F. Supp. 3d 236 (D.D.C. 2020). Specifically, the Ewan court calculated prejudgment interest by producing a multiplier calculated using the date of the injury, the date of judgment, and the average annual prime rate during the intervening period. 466 F. Supp. 3d at 250 n.3. Plaintiffs have calculated a prejudgment interest through May 11, 2026.

Although some courts have awarded such interest, "the overarching tide of persuasive precedent . . . plainly weighs against awarding prejudgment interest" because "pain and suffering and solatium damages are both designed to be fully compensatory[,]" rendering prejudgment interest unwarranted. Gration v. Islamic Republic of Iran, No. 21-CV-1859 (BAH), 2023 WL 5221955, at *36 (D.D.C. Aug. 15, 2023); see also Doe A-1 v. Democratic People's Republic of Korea, No. 18-cv-252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) (Friedrich, J.) (denying prejudgment interest because the award "in today's dollars fully compensates the crew members and their estates for their time spent in captivity" (emphasis in original)); Bathiard v. Islamic Republic of Iran, Case No. 16-cv-1549 (CRC), 2020 WL 1975672, at *8 (D.D.C. Apr. 24, 2020) (Cooper, J.) (holding "prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation"); Schertzman Cohen v. Islamic Republic of Iran, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *10 (D.D.C. Jul. 11, 2019) (Boasberg, J.) (denying prejudgment interest because "direct-injury and solatium awards [are] to be fully compensatory" already). Consistent with this persuasive precedent, the Court declines to award prejudgment interest.

E. Punitive Damages

Plaintiffs also seek an award of $674,085,709 in punitive damages, to be distributed in proportion to each plaintiff's share of total compensatory damages. [Dkt. No. 41] at 34. "Punitive

damages 'serve to punish and deter the actions for which they [are] awarded,'" Force, 617 F. Supp. 3d at 39 (quoting Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 87 (D.D.C. 2010)) (alteration in original), "and are expressly contemplated by the FSIA[.]" Id. (citing 28 U.S.C. § 1605A(c)). Courts considering FSIA claims "have concluded that '[p]unitive damages are warranted where defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others.'" Id. (quoting Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 86 (D.D.C. 2017)) (alteration in original).

In calculating punitive damages, plaintiffs propose calculating the total compensatory damages awarded for a victim and then multiplying that award by a factor of two, asserting that courts have "used a multiplier between one and five" of compensatory damages to calculate punitive damages. [Dkt. No. 41] at 28. The Court declines to apply this method "because only '[a] minority of judges . . . follow this approach . . . ." Amirentezam, 2023 WL 5724121, at * 28; see Abedini v. Gov't of Islamic Republic of Iran, 422 F. Supp. 3d 118, 142 (D.D.C. 2019) ("[T]he method of applying a court-determined multiplier of compensatory damages was only utilized in a special circumstance during actions against Iran by hundreds of plaintiffs who were family members or victims themselves of the Beirut bombing.").

Instead, the Court will follow those courts that have considered punitive damages in FSIA cases and awarded punitive damages equal to compensatory damages. "Numerous courts with facts similar to those here have followed this method." Amirentezam, 2023 WL 5724121, at *28 (collecting cases). "Not only does this approach have 'the merit of following Supreme Court precedent on punitive damages,'" id. (quoting Selig v. Islamic Republic of Iran, 573 F. Supp. 3d 40, 77 (D.D.C. 2021), but "equalizing compensatory and punitive damages still acts as a

'forceful deterrent against Iran's further support' and commission of terrorist acts," id. (quoting Sheikh v. Republic of Sudan, 485 F. Supp. 3d 255, 273 (D.D.C. 2020)). Accordingly, the Court will grant each plaintiff punitive damages that equal their compensatory damages.

F. Post-judgment Interest

"[I]nterest shall be allowed on any money judgment in a civil case recovered in a district court." Forest Sales Corp. v. Bedingfield, 881 F.2d 111, 112 (4th Cir. 1989) (quoting 28 U.S.C. § 1961(a)). This includes money judgments against a foreign sovereign over whom the court has jurisdiction. Gration v. Islamic Republic of Iran, 2023 WL 5221955, at *37 (D.D.C. Aug. 15, 2023). Plaintiffs seek $1,011,128,563 in post-judgment interest from the judgment date to the date of payment. That request will be denied because there is no reasonable way to calculate the time period during which the judgment will remain unpaid. Instead, post-judgment interest at the rate mandated by 28 U.S.C. § 1961(a) will be imposed.

## V. CONCLUSION

For the above stated reasons, plaintiffs' Motion for Default Judgment as to Liability, [Dkt. No. 36], will be granted and their Motion for Default Judgment as to Damages, [Dkt. No. 39], will be granted in part by a Default Judgment Order to be issued with this Memorandum Opinion.

Entered this 8th day of September, 2026.

Alexandria, Virginia

/s/ LMB
Leonie M. Brinkema
United States District Judge